**Page 1**

UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF TENNESSEE

Case No. 25-23473-mrh

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

PAULA ANTWANETTE MILNER,

          Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                  United States Bankruptcy Court

                  200 Jefferson Avenue

                  Memphis, TN 38103

                  February 25, 2026

                  12:02 PM

B E F O R E :

HON M. RUTHIE HAGAN

U.S. BANKRUPTCY JUDGE

ECRO:  UNKNOWN

**HEARING re Emergency Motion to Extend Time to Appeal Under Rule 8002(c) Filed by S. Joshua Kahane on behalf of MILLINGTON OAKS APARTMENTS (Kahane, S. Joshua) (Entered: 02/25/2026).**

**Transcribed by:  Sonya Ledanski Hyde**

Page 3

A P P E A R A N C E S :


LAW OFFICE OF ARTHUR A. BYRD, JR.

        Attorneys for Debtor

        116 Mulberry Street East

        Collierville, TN 38017


BY:   ARTHUR A. BYRD, JR.


GLANKLER BROWN PLLC

        Attorneys for Millington Oaks Apartments

        6000 Poplar Avenue

        Memphis, TN 38119


BY:   AUBREY GREER

        S.T. RAYBURN


ALSO APPEARING:

        PAULA ANTWANETTE MILNER

**I N D E X**

| WITNESSES: | DIRECT: | CROSS: | REDIRECT: | RECROSS: |
|---|---|---|---|---|
| **PAULA ANTWANETTE MILNER** | 7 | 15 | 20 | 22 |

**EXHIBITS: (None)**

P R O C E E D I N G S

THE COURT:  For a moment, to give you the opportunity to watch a couple of the other ones, potentially.  Mr. Byrd, I give you the floor to tell me which one you want to proceed with first.  And we have Mr. Bergstrom appearing virtually for the Chapter 13 case that he has.

MR. BYRD:  Yes, Your Honor, I have -- thanks.

THE COURT:  And I will need appearances, too.

MR. BYRD:  And they're different trustees, so whichever one.  I can do either one first.  But both parties are here.

THE COURT:  Let's do Milner first, and I don't -- that's Cruse-Turner.  So, Milner, and then let me take appearances, too, so I know the parties.  I know Mr. Rayburn, and who else do we have?

MR. GREER:  Good morning, Your Honor.  Aubrey Greer, also Glankler Brown.  I'm Mr. Kahane's law partner. He could not be here today, he had an unavoidable conflict in Mississippi, I think he had actually tried to get this rescheduled so he could personally address the Court. Understanding the Court wanted to hear the matter today, I am here, Your Honor.

THE COURT:  The -- I know the parties tried hard, but the problem was that I also had a pro se debtor.  And

Page 6

so, I can't -- it's not as easy to push that around, especially when they usually are taking time off of work and so they've already made those plans.

MR. GREER:  I appreciate that, Your Honor.

THE COURT:  But I'm sure he -- I know that he would have wanted to be here, but I am positive you will represent him well.

MR. GREER:  I will do my best, Your Honor.

THE COURT:  Okay.  All right, so in the Milner case, I -- let me get where I need to be, but I probably threw all my stuff together.  Okay, so in Milner, I have reviewed the docket in advance of today's hearing.

I have Mr. Byrd's affidavit, Attorney Fee Affidavit, which was filed at Docket Entry 49.  I have Mr. Byrd's Affidavit of Damages signed by Ms. Milner, which was filed at Docket Entry 50.  And then I have the receipts related to that affidavit filed at Docket Entry 51.  And I will assume that the parties have received those and have reviewed those.

MR. GREER:  Yes, ma'am.

THE COURT:  Okay.  Mr. Byrd, you have the floor.

MR. BYRD:  Yes, Your Honor.  Unless there's any objections, I'm going to call Ms. Milner and simply go through her Affidavit of Damages.  I'm more than happy to go through my Attorney Fee Affidavit to whoever would like for

me to.

THE COURT:  We'll give them the option if they want to put you on the stand.

MR. BYRD:  Otherwise, I'm going to largely rely on the attorney fee affidavit, Your Honor.

THE COURT:  Okay.

MR. BYRD:  But we'll call Ms. Milner.

THE COURT:  All right.  Ms. Milner.  You will look to Ms. Joyner and raise your right hand.

CLERK:  Do you solemnly swear or affirm that the testimony you're about to give in this call shall be the truth, the whole truth, and nothing but the truth, so help you God?

MS. MILNER:  I do.

CLERK:  Thank you.  Please be seated.

DIRECT EXAMINATION OF PAULA ANTWANETTE MILNER

BY MR. BYRD:

Q    Ms. Milner, will you please state your name for the court?

A    Paula Antwanette Milner.

Q    Ms. Milner, I'm going to go through with you the affidavit.  You signed this affidavit in my office in advance of this hearing, correct?

A    Yes, sir.

Q    And these receipts that have been provided,

Page 8

they're attached to the affidavit.  You provided those to

me?

        A    Yes.

        Q    And they're in relation to the eviction that

occurred in August of this year after we filed this case,

correct?

        A    Correct.

        Q    I'm going to go through each of them with you.

The first one that is attached is a U-Haul receipt, and

you've seen this.

        A    Yes.

        Q    And you went to U-Haul on what day?  August 13th

was the set-out date, correct?

        A    Yes, I went there August 13th --

        Q    Okay.

        A    -- that afternoon.

        Q    Okay.  And you had the -- all of your belongings

were outside of the house, correct?

        A    Correct.

        Q    And you had no means to transport them anywhere

else?

        A    Correct.

        Q    You went to U-Haul to store all of your belongings

for that time period.  Is that accurate?

        A    Yes.

Page 9

Q     Do you recall how long you kept the U-Haul?

A     I kept it for four days.

Q     Okay.  And the receipt that we have here that you provided to me, this is the initial deposit to rent the U-Haul, is that right?

A     Correct.

Q     And there was another charge that you paid when you returned the U-Haul?

A     Correct.

Q     And that totals up to $514.49?

A     Yes.

Q     The next item, when you left the property on the 13th or the 14th, you went and rented that hotel, correct?

A     Yes.

Q     And you went to the Motel 6 in Millington?

A     Yes.

Q     And you provided me the receipts that I guess you're charged daily for that motel, correct?

A     Correct.

Q     And you stayed there from August 13th, it appears, to I believe it's October 16th?

A     Correct.

Q     Okay.  At the end, you paid with a credit card. What we have on your affidavit is a credit card total of $3,514.88, correct?

A    Correct.

Q    And that is for those two months.  What we had discussed that is not in this affidavit, it appears to me that you paid $473.28 in cash, which I assume was a deposit, correct?

A    Correct.

Q    So, the total you paid is $3,514.88, which you paid on a credit card in addition to the $473.28, is that correct?

A    Correct.

Q    Okay, and it's the $473.00 that's not listed in the affidavit (indiscernible).  Okay, so in addition to that, you did not have a refrigerator when you went to this Motel 6, is that right?

A    That's correct.

Q    Okay.  And when you were set out of your residence, what happened to the -- your food in your refrigerator or the food that you had in your residence at the time, was any of that salvageable?

A    It was not.

Q    Okay.  And so, in the week that followed, you had to replace those items, and you came up with the receipts you could, correct?

A    Correct.

Q    And in our discussion, you probably spent more

Page 11

than the receipts that you provided, but this is what you could come up with?

A    Correct.

Q    Okay.  And what's also included in the exhibit and the affidavit, we have a Walmart receipt from August the 23rd.  That totals up to $119.82, is that correct?

A    That's correct.

Q    I have a Dollar General Store receipt from August 18th.  That receipt totals to $35.84, is that correct?

A    That's correct.

Q    And an Ollie's Good Stuff Cheap receipt on August 15th.  That totals up to $20.80.

A    Correct.

Q    Okay.  And because you didn't have any food in the hotel, you were eating out more frequently, is that right, or at least in the week that followed before you replaced everything, is that right?

A    That's correct.

Q    And what we've included in the exhibit, a Church's Chicken receipt on August 23rd, $15.02.  Is that correct?

A    Correct.

Q    Another Church's Chicken receipt on August 16th for $15.02, is that correct?

A    That's correct.

Q    And it looks like a Little Caesars receipt on

Page 12

August 20th for $8.54, is that correct?

A    Correct.

Q    And again, these are what you could find when you were eating out more frequently, is that accurate?

A    That is accurate.

Q    All right.  After August 16th, you got a new residence, is that right?

A    Yes.

Q    After October 16th, I'm sorry.  I think I said August.

A    Yes.

Q    And you had to pay a security deposit for that residence, correct?

A    I did.

Q    And that total was $785.00 for the deposit?

A    Correct.

Q    And you are still with the same employer as when we filed?

A    We just had a contract change --

Q    Okay.

A    -- about four weeks ago.

Q    The same employer, different owner type of thing?

A    It's on the military, so it's the same employer, just different contract, yes.

Q    I got you.  Okay.  And from your pay stubs, you

Page 13

make $28.56 per hour, correct?

     A     That's correct.

     Q     And in an eight-hour day, that comes to $228.46,
correct?

     A     Correct.

     Q     So August -- the day after the set out, you did
not -- you could not work, correct?

     A     Correct.

     Q     Okay.  And you and I -- you came down here with me
during one of these hearings.  That was December the 17th.
And that day, you didn't work, is that correct?

     A     Correct.

     Q     And you had to pay for transportation to get down
here that day?

     A     I did.

     Q     Who did you pay?

     A     A co-worker.

     Q     Okay, how much -- you paid him $15, is that
accurate?

     A     Yes.

     Q     And then today, you're missing a day of work
today, correct?

     A     Correct.

     Q     How did you get down here today?

     A     Lyft.

Page 14

Q    Do you know how much you paid them to make it here?

A    $36.

Q    Does that cover your round trip?  Are they waiting for you outside?

A    No, my daughter's coming to get me.

Q    Okay.  All those items in that, by the math that we looked at, totals up to $5,736.13.  Does that sound right?

A    That's correct.

MR. BYRD:  All right, Your Honor, I don't --

THE COURT:  Plus the $400?

MR. BYRD:  Plus -- yes, plus the $400 --

THE COURT:  Okay.

MR. BYRD:  -- that is not in the affidavit.  Let me give you an exact number.

THE COURT:  6,136.13.

MR. BYRD:  $473.28 is what I see on the cash.  Yes, Your Honor.

THE COURT:  Like, it's not 4, it's 5.  I mean 6.  61, 36, 13.  Is that the number you have?

MR. BYRD:  When I add the $473.28, yes --

THE COURT:  Oh.

MR. BYRD:  -- I believe so, Your Honor.

Page 15

THE COURT:  Say the number again.

MR. BYRD:  $473.28 is the cash receipt on Page 7 of the exhibit.

THE COURT:  I do better with round numbers.

MR. BYRD:  Yes, Your Honor.

THE COURT:  So now I have to pull out a calculator.  $6,209.41.

MR. BYRD:  Yes, Your Honor.  I don't have any further questions at the moment.

THE COURT:  Mr. Greer?

MR. GREER:  Thank you, Your Honor.

CROSS EXAMINATION OF PAULA ANTWANETTE MILNER

BY MR. GREER:

Q    Good morning, Ms. Milner.  My name is Aubrey Greer.

A    Good morning.

Q    We've never met before, but I am counsel for the apartment complex.  I just want to ask you a couple follow-up questions.  Is that okay?

A    That's okay.

Q    Okay.  From the testimony you just gave, it sounds like you resided at the Motel 6 in Millington from August of 2025 through October of 2025.  Is that correct?

A    That's correct.

Q    Okay.  When did you first start looking for

Page 16

alternative housing?

A     From the hotel?

Q     Correct.  Yes, ma'am.

A     Immediately, but I didn't get a chance to find it until October.

Q     Okay.  And were you looking at other apartment complexes in the Millington area?

A     Apartments and houses, yes.

Q     Okay.  And did you actually fill out an application for any of those apartment complexes you were looking at?

A     I did not.

Q     Okay.  What apartment complex did you ultimately end up signing a lease for and moving into?

A     Millington Oaks.

Q     Okay.  So, other than for the one that you moved into in October, you did not submit an application to any other apartment complex or housing complex other than that one.

A     No.

Q     Is that correct?  Okay.  And what is your current monthly rent in your new place?

A     $875.00.

Q     $875.00.  And your rent in the prior apartment, the apartment we're here about today, was $1,200.00.  Is

Page 17

that correct?

A    Yes.

Q    Okay.  Now,  in terms of your employment, you make $28.56 per hour.  Is that correct?

A    That's correct.

Q    And you work for 22nd Century Technologies?

A    Yes.

Q    What is 22nd Century Technologies?  What do they do?  Or what do you do?

A    IT.

Q    IT?

A    Yes.

Q    Okay.

A    I'm a tech writer, but it's an IT company.

Q    Okay.  What does a tech writer do?

A    We make instructions for computer equipment, instructions for, like, education.  Any instruction manual is what a tech writer would write.

Q    Okay.  And how long have you worked at 22nd Century Technologies?

A    This is my second year.

Q    Second year.  Are you full-time or part-time?

A    Full-time.

Q    Okay.  What are your normal days off?

A    Saturday and Sunday.

Page 18

Q    Saturday and Sunday.  So, you work Monday through Friday.

A    Correct.

Q    9:00 to 5:00?

A    6:00 to 2:00.

Q    6:00 to 2:00?  All right, all right.  Okay.  And in terms of the places that you looked at when you were looking for substitute housing between August and October 2025, other than the place that you now reside, the place you ended up, what other -- do you remember the names of the other places you looked at for substitute housing?

A    I looked at the Commodores --

Q    Okay.

A    -- that's in the city of Millington.  I also used at -- looked at Millington Flats, which is down the way, and a few houses that were for rent.

Q    Okay.

A    And I also looked for Airbnb's.

Q    But you did not make an application to either the Commodores or the Millington Flats, correct?

A    The Commodores was full.

Q    Full?  Okay.

A    The price at the Millington Flats was too much.

Q    Okay.  More than the $1,200 you were already paying?

A    Correct.

Q    Okay.

A    And there were no Airbnb's available.

MR. GREER:  That's all I have, Your Honor.

THE COURT:  I have one question that I should have asked while Mr. Byrd was questioning, so that it would have opened the door for everybody, so I might give everybody an opportunity to follow up.  What did you do with your stuff for the two-month period?

THE WITNESS:  It was in storage.

THE COURT:  The U-Haul storage or --

THE WITNESS:  It was Freedom --

THE COURT:  Did you pay for that storage?

THE WITNESS:  Yes, ma'am, I did.

THE COURT:  Was that included?

MR. BYRD:  It's not, Your Honor.  It's not included in there.

THE COURT:  Is there a reason why it wasn't included?

THE WITNESS:  It's my fault.

MR. BYRD:  It's my fault.

THE COURT:  Do you want to testify as to what that amount is?

MR. BYRD:  Be happy to, Your Honor.

THE COURT:  Okay.  I'll let you.  I'll open the

Page 20

floor to both parties to -- for the scope of this question.

MR. BYRD:  And I appreciate that, Your Honor.  And if I may, there was something we discussed this morning, too, that we had left out, if there's no objection to at least talking about it.

REDIRECT EXAMINATION OF PAULA ANTWANETTE MILNER

BY MR. BYRD:

Q    Related to the storage, when did you get the storage unit?

A    I got the storage unit the 14th.  That --

Q    August the 14th?

A    Same day -- yes, yes.

Q    Okay.  Do you -- was it a daily cost, monthly cost?

A    It was a monthly cost.

Q    Do you recall what the monthly cost was?

A    $82.00.

Q    $82.00 and you had that from August 13th until at least October 16th?

A    Well, I still have it now.

Q    You still have it now?

A    Yes.

Q    You said it was $82 per month even?  Is that right?

A    Well, it was probably less, but I pay $82.00 a

Page 21

month.

Q    Okay.

A    I think it's like $81.00 and some change.

Q    Okay.  And you had mentioned this to me yesterday and this morning.  At the end of October, you had to take off work.  Is that right?

A    Yes, sir.

Q    And that was from the VA due to disability.  Is that correct?

A    Yes, sir.

Q    Okay.  And the reason for the disability was what?

A    The whole situation took a toll on me mentally.

Q    Okay.  And so, you saw a doctor at the VA?

A    I did.

Q    And they told you that -- what was the best course of action?

A    To -- since I was having difficulty functioning, to take some time off.

Q    Okay.  Was that due to depression?

A    Yes, sir.

Q    Okay.  And so, from -- I think from the numbers you showed me, October 28th, you stopped working and then you returned December the 12th.  Is that right?

A    Yes, I had to think of the dates.

Q    It's about five --

A     Yes, sir.  It was five weeks.

Q     -- weeks off.

A     Yes.

Q     And it was -- you didn't get paid short-term disability during that time?

A     I did not.

Q     Okay.  You were approved for short-term disability and to take off, but your employer approved the time off and the short-term disability didn't start coming?

A     Correct.

Q     Is that right?  Okay.

MR. BYRD:  Your Honor, that's all I have.

MR. GREER:  May I, Your Honor?

THE COURT:  Yes.

RECROSS EXAMINATION OF PAULA ANTWANETTE MILNER

BY MR. GREER:

Q     Thank you, Your Honor.  Just doubling back to the storage unit very quickly.  So, you said you still have it today?

A     Yes.

Q     Are you still storing goods there today?

A     I am.

Q     Okay.  I guess why?

A     Because I was in a two-bedroom, and when I moved in with my daughter, I -- there's no -- there's not enough

room.

Q    Okay.

A    So.

Q    So it's overflow essentially.

A    Correct.

Q    Okay.  And in terms of the questions you just answered, you sought treatment at the VA, is that correct?

A    Yes, sir.

Q    Are you a veteran?

A    I am a veteran.

Q    I am as well.  Thank you for your service.

A    Thank you.

Q    And why did you go to the VA to seek treatment?

A    Because I had been struggling with, like, the whole -- my life being turned upside down with zero notice, and I was really having difficulty functioning at work and with me already having depression.  It just made it -- ramped it up more than usual.

Q    I'm sorry to ask this question.  Have you been diagnosed with depression before all of this happened?

A    Yes.

Q    Okay.  Were you seeking treatment from the VA already for depression?

A    I hadn't seen a doctor in, like, six months before now.

Page 24

Q    But you sought treatment after this event because -- and I don't want to put words in your mouth, you felt like it raised some issues for you.

A    Yes, sir.

Q    Okay.  No further questions, Your Honor.

THE COURT:  Okay.  I'm going to bite my tongue.  I want to ask one more question, but I fear that I'm going to open the door one more time because it's just the logical movement of everything.  So how did you get your belongings into your new home?  Did you have to rent another U-Haul?  Did you use a friend?

THE WITNESS:  I had a friend that had a truck --

THE COURT:  Okay.

THE WITNESS:  --  but the smaller stuff I just put it in my car.

THE COURT:  Okay.  And then it sort of makes more sense to me now that I hear that there's still stuff in storage, that there wasn't the renting of the U-Haul the second time.  But I just wanted to close that gap in my mind.  All right.  Well, thank you for your time, Ms. Milner.  You may step down.

For the attorney's fees, Mr. Greer, do you want any testimony?

MR. GREER:  I'm not really sure it's a testimonial issue, Your Honor.  I think it's more along the lines of the

standards of approving awards of attorney's fees, particularly in federal court, not only in Tennessee, but elsewhere, which is something I do routinely on both sides. Typically, an attorney fee affidavit will be supported by things like billing statements, specificity as to the task performed, why they were performed, what they relate to.

There's also always in the Western District of Tennessee an accompanying affidavit from another attorney that practices in the local area attesting to the reasonableness, not only of the work, but of the amount of the fees.  It's very difficult to evaluate whether or not, you know, what all of these things pertain to.  I have some concerns about $40.00 a text message.

I have some concerns about the length of the hearing, four hours in total between the two sessions.  In talking with both Mr. Kahane and Mr. Rayburn, I don't think it took that long.  But I've got some concerns with it.  I don't think that there's -- this comes close to meeting the standards for an award of attorney's fees in federal court.

THE COURT:  So, in bankruptcy, we follow the Boddy v. U.S. Bankruptcy Court.  In Re Boddy, it's at 950 F.2d 334.  It's a Sixth Circuit case from 1991, in which we have a slightly different standard.  But I hear you on what may be a lengthy hearing or two lengthy hearings.  I know from my recollection is that there was one hearing that we had to

Page 26

wait for a significant time for Mr. Kahane to appear.  So, I handled the rest of the docket and went back.

I think I even handled my Chapter 11 docket, which is unique, because I would have let you go before.  So, that likely is why one of the hearings is long.  I'm trying to see where the other hearing is.  And if it was – help me find that one, Mr. --

MR. GREER:  12/17/2025, Your Honor.

THE COURT:  Thank you.

MR. GREER:  It's on the second page about halfway down.

THE COURT:  Actually, it was the other case, wasn't it?  Mr. Byrd.

MR. BYRD:  It was Mr. Cain's --

THE COURT:  Yeah.

MR. BYRD:  Mr. Cain's case in which we were waiting.  That is accurate.  And the second hearing on Ms. Milner, I guess you can attest to it, but you know, if we want to cut down on the time that we were actually here, that's the time I was actually here, but understandable, Your Honor.  And I'll be totally honest with you, I've looked at this as well, and I don't think attorneys are paid as gross amount of money as what I thought.

And then the second thought was all these things are backed up by the docket, right?  So, there's a review of

a supplemental response.  This wasn't just a -- Mr. Cain's case was a little bit more complex.

THE COURT:  Right.

MR. BYRD:  This one wasn't.  There were supplemental responses.  There was everything that went into it.

THE COURT:  Because there's the additional exception.

MR. BYRD:  There was a supplemental response that was filed on a Monday night, and I responded to that supplemental response the same Monday night four hours later.  So, as I might, from first glance, say that is kind of a gross amount of money, it doesn't mean it's inaccurate. I don't normally work until 8:00 at night or 9:00, it's not standard procedure.  But with all that said, I understand the concerns.  The accuracy of the affidavit is true.

MR. GREER:  And it's -- it makes me a little uncomfortable to question another lawyer's fee affidavits. Lawyers obviously deserve to be compensated for their time.

THE COURT:  Mm hmm.

MR. GREER:  So, it puts me in a little bit of an awkward position.  I just, at first glance, 30 hours on this particular issue seemed a little high.  I just filed a motion for summary judgment in a death case in front of Judge Parker, $30 million in damages.  I put in less than 30

hours on that MSJ.  I've reviewed the stuff in here, and I understand there's some nuance to it.  But a lot of the papers don't have sort of this searching legal analysis that required, you know, this vast amount of work.  It's actually relatively straightforward.

Again, I understand there's some nuance to it about, you know, whether -- you know, how 362 applies.  I just -- 30 hours strikes me as a little high.  And that's one of the considerations in a fee award, is whether or not the time expended matches, you know, what the issues were, what was done, time expended by another attorney to do similar work.

So, again, I was not involved in this prior.  So, again, it makes me a little uncomfortable.  I'm not saying that Mr. Byrd did not spend time working on this.  That's not my thing.  It just --

THE COURT:  And I also assume that you don't deal with consumers that often, that sometimes they create a little bit more work for, especially Mr. Byrd, because you're the point of contact versus a more sophisticated client, maybe has less questions, maybe knows that that phone call is going to get 0.1 billed to them, and so there's less communication sometimes.

But I hear you, and I will take that into consideration.  I've made a note to myself to probably do a

little bit extra in the Boddy analysis, and so I will take your additional comments into consideration.

MR. GREER:  Thank you, ma'am.

THE COURT:  Okay.  Anything else on the Milner case?

MR. GREER:  Yes, I'm sorry, Your Honor.  And, again, I apologize because I was not involved with some of this.  I had spoken with Mr. Kahane last evening when I found out I was going to be appearing in front of Your Honor.  It was Mr. Kahane's understanding, and I think Mr. Rayburn shares this, is that the motion both as to the Milner case and as to the Cain case, which we'll get to, the sanctions against Glankler Brown and/or Mr. Kahane individually, that was withdrawn.  It was only as to the property.

And I just wanted to make sure that whatever order we have reflects that.  I thought -- my understanding was you had agreed to that, but I don't want to speak for anybody.  I just -- Mr. Kahane had raised that issue to me, so I wanted to raise it with the Court.

MR. BYRD:  If I may, and maybe part of this just relates to the attorney's fees.  I don't mean any disrespect by this at all.  I mean, it's a great thing and probably a proud thing.  If we start from Ms. Milner's first case, I have dealt with four different attorneys from Glankler Brown

Page 30

on this, and that's awesome.  That's a big law firm.  Ms. Milner can attest to this.  She's dealt with one.  Every single one of these was neat, and so, you know, I appreciate all this stuff.

So, with that, I did speak to Mr. Kahane on that withdrawal, and I discussed with him.  I know exactly what he was talking about.  Your Honor had asked me to produce an email from Glankler Brown, to which I said I'm not willing to do so, and I will stand on the proof that I have.

THE COURT:  That's what I recall, because I was looking for an email for the record, and whenever I asked for it during one of the hearings, one of the follow-up hearings, I think that maybe Mr. Byrd did not want the Court to see language in an email, and so he chose not to produce that.  But I don't know that I ever heard him say, I'm withdrawing the sanctions against the law firm.

MR. GREER:  Okay.  I just -- again, I was not present for any of that.  I didn't --

THE COURT:  Right.

MR. GREER:  -- take part in any of those discussions, so a lot of what I have is either --

THE COURT:  And I'm happy to go back and --

MR. GREER:  -- second-hand.

THE COURT:  -- listen to a record, if Mr. Rayburn can tell me which hearing you believe that that was at.

MR. RAYBURN:  I don't know off the top of my head which hearing that that was at.  I want to say that it was my recollection that it was (indiscernible) but I could very easily be incorrect.  My memory is far, far from perfect.

THE COURT:  If you want to -- because that's a big deal.

MR. GREER:  I just want to make --

THE COURT:  Right, I mean it's --

MR. GREER:  -- put it another way.  If it's on the record, it's on the record, and I just want to make sure that --

THE COURT:  Right.

MR. GREER:  -- that's reflected.  If it's not on the record, it's not on the record.

THE COURT:  Yeah.  And then I'll wonder is it my job to go look in the record to see if I can find it.  I don't know if it's my job, but in thinking about the appeal purposes, you know, is that an easy, fixable mistake if I did make a mistake, but I don't believe that I did.

So, I might go back and listen to those.  I think it was in a Milner hearing, and I think we only had two hearings in Milner, and so I'll go back and listen.

MR. RAYBURN:  Yes, because I believe I was there when it happened.

THE COURT:  I think it was the second one because

Page 32

it was when I asked about the e-mail.

MR. RAYBURN:  And I was not at the January 7th hearing on Cain.

THE COURT:  Okay.

MR. RAYBURN:  If I remember right, because, which is part of the reason he handled it, because I was tied up elsewhere.

THE COURT:  And then the law firm was named, and we're not to the Cain case, but they were named in the Cain case also, and then they were not named in the pro se.

MR. GREER:   I think that's correct, Your Honor.

MR. RAYBURN:  Thank you.  Your Honor, I think if I remember right from talking to Mr. Kahane, I think his concern was I think he at least either way interpreted it as a withdrawal.  And so, from that point forward, he was entirely focused on defending Millington Oaks as opposed to defending Glankler Browns' -- or the motion for sanctions against Glankler Brown because it was his understanding of whatever did end up being said that the motion for sanctions was being withdrawn against Glankler Browns.

So, he wasn't -- he had kind of stopped discussing that issue and defending that issue at the hearing.

THE COURT:  Okay.

MR. RAYBURN:  I think that was kind of his concern.

Page 33

THE COURT:  Okay.  Anything else?

MR. GREER:  Nothing in this room for me, Your Honor.

THE COURT:  Okay.  For Milner, I had something written out, but I'm going to edit it a little bit more based on additional argument today and additional testimony as to additional damages.  And so, I'm going to show the Milner case as taken under advisement, but I would suspect a very quick, probably by Friday order that determines the damages.  So, it will not be a lengthy time period.  So let me find my under-advisement dropdown.  All right.  Okay.  We will take up the Cain matter now.

MR. BYRD:  Your Honor, may Ms. Milner be excused?

THE COURT:  She may.  Thank you for noticing that.  All right.

(Whereupon these proceedings were concluded at 12:36 PM)

Page 34

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  March 17, 2026